IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| YEAKAIN YABU KOROMA, | Criminal No. 1:19-mj-368 |
| CORNELIUS MAURICE KING, JR., | |
| Defendants. | |

FILED AUG 19 2019 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Catherine Fields, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since January of 2010. I am currently assigned to the ATF Washington Field Division. My assignments include investigating individuals who are involved in the illegal possession and transfer of firearms, violent crimes involving firearms, and firearms trafficking. I was previously assigned to the ATF Phoenix Field Division, Tucson Field Office, for approximately three years where the majority of my investigations were focused on both domestic and international firearms trafficking, illegal possession of firearms, as well as arson and explosives investigations.

2. In 2004, I received a Bachelor's degree in Political Studies from Meredith College. I am also a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, which are conducted at the Federal Law Enforcement Training Center in Glynco, Georgia.

1

3. I submit this affidavit in support of a criminal complaint charging that YEAKAIN YABU KOROMA ("KOROMA") and CORNELIUS MAURICE KING, JR. ("KING"), neither being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, did willfully engage in the business of dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A), 923(a), 924(a)(1)(D), and 2.

4. The facts in this affidavit are based on my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit contains information necessary to establish probable cause, and it does not include all of the information known to me or the government.

## **PROBABLE CAUSE**

A. Cooperating Witness

5. On or about March 20, 2019, ATF Special Agent Bernard Mensah and I met with a cooperating witness (hereinafter "CW"), and received information about an individual suspected to be dealing in firearms without a license. CW stated that he had sold approximately forty (40) firearms to KING and his girlfriend, KOROMA. CW positively identified both individuals by photographs. CW indicated that he knew KOROMA from his employment, and met KING through KOROMA.

6. CW said that he initially started selling firearms to KOROMA but knew the firearms were, in fact, for KING. CW explained that he sold the firearms to KOROMA and completed bills of sale for those transactions, but he then started selling firearms directly to KING and did not do any bills of sale. KOROMA told CW that KING could make more money off the firearms he bought from CW because the firearms that CW sold KING were in good condition.

2

7.  Law enforcement reviewed four bills of sale between CW and KOROMA. These include bills of sale from CW to KOROMA for:

   a. a Smith & Wesson SD40VE .40 caliber pistol, for $300;

   b. a Kel-Tec P-11 9mm Luger, for $200;

   c. a Glock G30 .45 caliber pistol, for $425; and

   d. a Rossi .357 Magnum 6 Shot Black 2", for $200.

B.  Text Messages Between CW and KING

8.  On or about March 21, 2019, I was provided with information that there were text messages between KING and CW on CW's phone, which was examined during another ATF investigation. With the consent of CW, I searched the contents of CW's phone for information relevant to KING. CW confirmed that KING's phone number was stored in CW's phone as "Maurice (Yeakin)." The conversations between KING and CW spanned from January 3, 2018 to May 7, 2018, and mainly consisted of conversations about buying and selling firearms. There were over 1,150 messages concerning the sale and purchase of various firearms. For example:

   a. On January 9, 2018, CW offered to sell a .45 caliber Glock to KING for $575. KING agreed the same day to purchase the gun, writing, "I can just send Yeakin with the money tommorow just let me know in the a.m. when you up."

   b. On January 23, 2018, CW offered to sell a .40 caliber Smith & Wesson to KING for $300. KING agreed to buy the gun the same day. CW wrote, "I'm stuck at work but I can give it to Yeakin if you want or I can meet you after work." KING responded, "Ok imma send u her with the money." Later, KING wrote, "She on her way now just gave her the money." CW responded, "I'll drive over to Alexandria and give it to her."

3

c. On February 12, 2018, CW offered to sell KING a Glock 27. KING offered to pay $500 for the firearm. CW wrote KING, "You got it when you wanna get it." KING responded, "I will have it by today."

d. Later that same day, CW offered to sell KING a .45 caliber Glock 30S for $600. KING responded, "Ok im boutta come up widd the bread imma get it for sure."

e. On February 24, 2018, KING reached out to CW seeking to purchase a firearm for a third party. KING wrote, "Do u have any pistols on the market that u want to get rid of." CW told KING that he had a Springfield Armory XD .40, and he was willing to sell it for $550. KING declined, explaining, "My brother only has 400 rite now."

f. On February 27, 2018, CW messaged KING and said, "Hey bro if your brother or anyone else is looking for something a little less expensive I can get these SD40ve joints for $350," along with a picture of a firearm. CW noted he would need to order the firearms, "but they can be here by Saturday if I order now." KING responded, "Ok yea order em I can get people buy em for sure."

g. On March 3, 2018, CW wrote KING, "Hey fam I can bring you the Pt111 and the 36 tomorrow anytime for $850 you good with that." KING responded, "Ok that's kool."

h. Later that day, CW messaged KING, "Also bro if you know anyone I'll let this joint go for $300," along with a picture of a firearm. KING responded, "Ite I got u bro."

i. On March 5, 2018, CW wrote KING, "Do you want a Glock 26 for $525?" KING responded, "imma buy that Glock 26 from u whenever u get it."

4

j. On April 9, 2018, CW offered KING a Smith & Wesson M&P 9mm for $350. KING responded, "Can u bring it today" and bought the firearm the same day.

9. On or about September 22, 2018, a Springfield Arms 9mm pistol bearing serial number S3601605 was recovered in Washington, DC. On April 22, 2018, CW had sent KING a photograph of this firearm and told KING that he would be delivering it to KING that same day. CW confirmed to me and Special Agent Mensah that he sold this firearm to KING.

C. First Interview of KOROMA

10. On or about April 15, 2019, KOROMA consented to an interview in the lobby of her office building. Special Agent Mensah and I asked KOROMA if she would be willing to agree to an investigative interview, and she agreed. That interview was recorded. We asked KOROMA whom she purchased her firearms from, and KOROMA indicated the firearms were purchased from CW. KOROMA was unable to recall what specific firearms she purchased. When asked how many firearms she purchased, KOROMA stated, "About four."

11. I asked KOROMA what involvement KING had in the purchase and sale of firearms. KOROMA initially stated, "We bought guns from [CW] and that was it." I asked if KING was buying firearms from CW in order to sell the same firearms to other individuals. KOROMA replied, "Yes." I asked KOROMA why KING was selling firearms he had recently purchased from CW, and KOROMA responded, "Just to make extra money." KOROMA said CW would purchase firearms legally then sell them to KING. KOROMA estimated that KING bought two firearms directly from CW. When asked if KING bought firearms from anyone else besides CW, KOROMA stated that he did not.

5

12. When asked why KING did not purchase firearms from federal firearms licensees, KOROMA stated that KING was unable to purchase firearms legally because of a previous criminal conviction.

13. KOROMA claimed that the firearms KING sold were all sold to Virginia residents. Special Agent Mensah and I informed KOROMA that multiple firearms transferred to KING from CW have been recovered in Washington, D.C. and Maryland. KOROMA stated that those firearms were probably bought by individuals who took them into Washington, D.C. and Maryland. KOROMA stated she did not know how those recovered firearms ended up outside of Virginia.

14. Special Agent Mensah and I asked how much profit KING made on each firearm he sold, and KOROMA replied, "I don't even know because the thing is, they don't talk to me directly." KOROMA said that she never even drove KING to complete any firearms transactions.

15. KOROMA stated that she did not recall how many firearms were sold but she was sure no firearms were currently in their residence.

D. <u>Interview of Cornelius Maurice KING, Jr.</u>

16. On or about April 16, 2019, KING consented to an interview, in the lobby of his apartment building, in relation to firearms that he allegedly purchased and resold. KING agreed to meet me and Special Agent Mensah at a particular time, and let us into his apartment building for the interview. That interview was recorded.

17. KING stated that he never resold firearms to anyone. KING explained that the reason why he did not sell any firearms was because he went to a gun show and was not able to purchase a firearm. KING said that he talked to the Virginia State Police about why he was not

cleared to purchase a firearm, and they told him that he had to wait about a year before he could buy a firearm because of his criminal record.

18. KING said KOROMA met CW at her job. KING stated that he started assessing KOROMA's transactions with CW to make sure that CW was not trying to "finesse" KOROMA out of her money. KING also said that he met with CW personally to figure out what firearms he had and was willing to sell. KING claimed he would bring the firearms home to KOROMA because they were her firearms. KING also claimed that KOROMA would give him her money for the firearms. KING said, "She was willing to sell them to make the extra money for rent . . . she tried to profit off of it."

19. KING said he had bills of sale, and Special Agent Mensah and I asked if he could show them to us. KING went up to his apartment to retrieve them and returned with twenty-six (26) bills of sale. The bills of sales were all dated between January 19, 2018 and June 5, 2018. Sixteen (16) of the firearms were listed as sold to one individual. All of the bills of sale identified KOROMA as the seller. On each of the bills of sale, the seller's address is listed as KOROMA and KING's home in Prince William County, which is within the Eastern District of Virginia. The address listed for each of the buyers was also located in the Eastern District of Virginia. The types of firearms included in these bills of sale include:

    a. two Glock G30 .45 caliber pistols;

    b. a Remington RP9 9mm pistol;

    c. two Glock G27 .40 caliber pistols;

    d. two American Tactical .223/5.56 AR pistols;

    e. a Glock G23 .40 caliber pistol;

    f. two Smith & Wesson SD40VE .40 caliber pistols;

7

g. a Taurus Millennium G2 9mm pistol;

h. two Mini Draco 7.62x39 AK pistols;

i. a Springfield XD 9mm pistol;

j. a Glock G19 9mm pistol;

k. a Glock G26 9mm pistol;

l. a Hi-Point 3895TS Carbine .380 ACP rifle;

m. a Glock G36 .45 caliber pistol;

n. a Mossberg .22 LR pistol;

o. a Smith & Wesson M&P45 Shield .45 caliber pistol;

p. a Taurus Millennium PT111 9mm pistol;

q. a Glock G17 9mm pistol;

r. two Smith & Wesson M&P9c 9mm pistols;

s. a Glock G22c .40 caliber pistol; and

t. a .40 caliber pistol that was either a Smith & Wesson or a Springfield XD.

20. Moreover, KING said that all of the bills of sale that he provided pertained to firearms that were first obtained from CW.

21. KING said he personally bought only one firearm, an AR-15, off Armslist and sold that same firearm on Armslist when he needed money for rent.

22. KING said that he and KOROMA did not currently have any firearms.

E. Second Interview of KOROMA

23. On or about April 18, 2019, KOROMA agreed to a second interview with Special Agent Mensah and me in my government vehicle in the parking lot of her office. That interview was recorded.

8

24. KOROMA denied saying that KING was selling firearms. KOROMA claimed that she sold firearms and received the bills of sale. KOROMA said because of KING's criminal record, they thought that KING could not sell firearms. KOROMA said she sold the firearms instead because she does not have a criminal record.

25. KOROMA said the firearms were bought from CW and sold by her. KOROMA said KING would meet up with CW and receive the firearms, but KING never sold any firearms because her name was on the bills of sale. KOROMA stated, "My name is on the bill of sale, so I sold the guns." KOROMA said she sold the firearms "to get extra profit." When asked how she would arrange to sell the firearms, KOROMA said she and KING would meet people on Armslist. KOROMA said KING was teaching her to make sure people were not ripping her off. KOROMA said she was there for every single sale from Armslist.

26. Based on my training and experience, I know that the firearms discussed in this affidavit, and particularly in Paragraph 19, constitute firearms, pursuant to Title 18, United States Code, Section 921(a)(3), were not manufactured in the Commonwealth of Virginia and, therefore, the firearms traveled in, and/or affected interstate commerce.

27. I confirmed that neither KING nor KOROMA are licensed firearms dealers through ATF's Federal Licensing System (FLS).

## CONCLUSION

28. Based on the information contained in this affidavit, I submit that there is probable cause to believe that KOROMA and KING, neither being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, did willfully engage in the business of

9

dealing in firearms, in violation of violated Title 18, United States Code, Sections 922(a)(1)(A), 923(a), 924(a)(1)(D), and 2.

_____
Catherine Fields
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn and subscribed to before me this 19th day of August, 2019.

_____/s/_____
John F. Anderson
United States Magistrate Judge
Honorable John F. Anderson
United States Magistrate Judge
Alexandria, Virginia